PETER K. STRIS (SBN 216226)
  peter.stris@strismaher.com
VICTOR O'CONNELL (SBN 288094)
  victor.oconnell@strismaher.com
THOMAS E. LOGAN (SBN 307193)
  tom.logan@strismaher.com
STRIS & MAHER LLP
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
Telephone:   (213) 995-6800
Facsimile:   (213) 261-0299

*Attorneys for Plaintiff* PATRICIA
DU VALL, individually and as a
representative of a class of similarly
situated plan participants, on behalf of
the DISNEY SAVINGS AND
INVESTMENT PLAN[1]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| PATRICIA DU VALL, individually and as a representative of a class of similarly situated plan participants, on behalf of the DISNEY SAVINGS AND INVESTMENT PLAN, <br><br> Plaintiff, <br><br> v. <br><br> THE INVESTMENT AND ADMINISTRATIVE COMMITTEE OF THE WALT DISNEY COMPANY SPONSORED QUALIFIED BENEFIT PLANS AND KEY EMPLOYEES DEFERRED COMPENSATION AND RETIREMENT PLAN, JAY RASULO, CHRISTINE MCCARTHY, ALAN BRAVERMAN, BRENT WOODFORD, JONATHAN HEADLEY, JAYNE PARKER, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

---

[1] Additional counsel listed on signature page.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA

1.      Plaintiff, Patricia Du Vall ("Plaintiff"), by and through her attorneys, on behalf of herself and all others similarly situated, based on personal knowledge with respect to her own circumstances and based upon information and belief pursuant to the investigation of her counsel as to all other allegations, alleges as follows:

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

2.      Defendants invested the assets in the Disney Savings and Investment Plan (the "Plan") in The Sequoia Fund (the "Fund"), a high-cost mutual fund run by Adviser Ruane, Cunniff & Goldbarb and its Portfolio Managers, Robert D. Goldfarb and David M. Poppe (collectively, the "Fund Managers").

3.      Throughout 2015—in violation of the Fund's investment policies and despite the concerns of Fund shareholders—the Fund Managers concentrated the Fund's assets in a single stock, Valeant Pharmaceuticals, Inc. ("Valeant"). The Fund was the largest shareholder in Valeant in 2015, owning nearly 10 percent of Valeant. And Valeant represented more than 30 percent of the Fund's total assets.

4.      The Plan provides that Plan participants would have at least three investment funds into which they could invest their retirement savings and that "[e]ach such additional Investment Fund ***shall be diversified*** . . . ." *See* Plan Document § 6.01(h)(i) (emphasis added). The Plan also states that "[t]he Company recognizes that an investment in an undiversified fund . . . is subject to greater risk than is an investment in a diversified fund . . . ." *Id.* § 6.01(a)(i)(D). Accordingly, the Fund violated the Plan's investment policies by offering the Fund as an investment option for participants. Moreover, Valeant had a well-known reputation for misleading investors with faulty accounting and profit expectations and gouging consumers in the sale of pharmaceuticals. In the process, Valeant had earned a nickname, "the Pharmaceutical Enron," which subsequently turned out to be all-too-true for its investors, including the Sequoia Fund and through the Fund, the Plan and its participants.

5.     In October, 2015, despite the warning signs and Sequoia's already concentrated position, the Fund Managers bought *even more* shares of Valeant for the Fund. On May 31, 2016, Sequoia announced it finally sold half of its holdings in Valeant, reducing its ownership of the company to under 5 percent, but by that point Valeant's stock had already dropped by over 88 percent in less than a year. Valeant's stock price has shed an additional 20 percent since then.

6.     Because of its concentration in Valeant and its fees, the Fund underperformed its benchmark, the S&P 500 Index, by 6.14% in 2014, 8.68% in 2015, and 15.17% from January 1 through June 15, 2016.

7.     Despite these violations of both the Plan's and the Fund's investment policies, public warnings, high fees and poor performance, Defendants have and continue to invest a significant portion of the Plan's assets in the Sequoia Fund.

8.     This is a class action brought pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the fiduciaries of the Plan. All of the Plan's investments are all held in the Disney Savings Plan Master Trust (the "Master Trust"), which also holds the investments of other retirement plans offered by The Walt Disney Company (the "Company").

9.     This case concerns Defendants' imprudent management of the Plan's assets by failing to remove the Sequoia Fund from the Plan when it became apparent that the Fund was no longer a suitable investment for participants' retirement savings. Defendants were required by ERISA to exercise due care, skill, prudence, and diligence when making decisions with respect to selecting, removing, replacing, and monitoring the Plan's investments. Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiff, the Plan, and the other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor

investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In violation of these duties, Defendants selected and repeatedly failed to remove or replace the Fund.

10.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and their Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

11.     Plaintiff's First Cause of Action alleges that it was imprudent to permit the Plan to maintain the Sequoia Fund as an investment option as the Fund became increasingly concentrated in Valeant and less diversified in 2015 in violation of Plan requirements and prudent retirement plan management.

12.     Moreover, public information demonstrated that the Sequoia Fund was an extremely risky investment which was imprudent for the investment of retirement assets. Specifically, the Fund was violating its investment policies by highly concentrating its assets in the common stock of Valeant, despite numerous warnings that Valeant relied on an uncertain business model whose price was artificially inflated due to questionable accounting practices.

13.     Defendants allowed the imprudent investment of the Plan's assets in the Sequoia Fund throughout the Class Period despite the fact that Defendants clearly knew or should have known that the Sequoia Fund was an imprudent investment. A prudent fiduciary would have recognized that as a consequence of the public information about the riskiness of the Sequoia Fund, the Plan's significant investment of employees' retirement savings in the Sequoia Fund would inevitably result in devastating losses to the Plan and, consequently, to the Plan's Participants.

14.     Plaintiff's Second Cause of Action alleges that all Defendants are liable for their co-fiduciaries breaches because they (i) knew of the other fiduciary's

breaches and failed to remedy them, (ii) knowingly participated in a breach, and/or (iii) enabled the fiduciary breach through their own actions/inactions.

15.     Plaintiff, a participant in the Plan, brings this action concerning the Plan's investment in the Sequoia Fund, individually, as a representative of the Plan and, to the extent appropriate, on behalf of a class of all participants in the Plan whose retirement assets are invested in the Master Trust that invested in the Sequoia Fund, from January 1, 2015, through and including the date of judgment in this Action (the "Class Period").

16.     This action is brought on behalf of the Plan and seeks to recover losses to the Plan resulting from Defendants' breaches of their fiduciary duties pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiff's claims apply to the Plan, inclusive of all Participants with accounts invested in the Fund during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief for the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this lawsuit on behalf of the Plan and all Participants and beneficiaries of the Plan during the proposed Class Period.

17.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plans for all losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief, including disgorgement.

## **JURISDICTION AND VENUE**

17.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

18.     This Court has personal jurisdiction because Defendants administered and breached their duties to the Plan and have their principal place of business and/or reside in this District.

19.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b)-(c) because Defendants administered and breached their duties to the Plan and have their principal place of business and/or reside in this District.

## **PARTIES**

20.     Plaintiff is a resident of Vero Beach, Florida. Plaintiff is a participant in the Plan whose account was invested in the Sequoia Fund throughout the Class Period.

21.     Upon information and belief, Defendant Investment and Administrative Committee of The Walt Disney Company Sponsored Qualified Benefit Plans and Key Employees Deferred Compensation and Retirement Plan ("Committee") is an unincorporated association which is the Plan's administrator and named fiduciary. Its principal place of business is in Burbank, California, the headquarters of the Walt Disney Company.

22.     The individual members of the Committee are dictated by the Disney Savings and Investment Plan, As Amended and Restated, effective January 1, 2010 (the "Plan Document"). Section 9.01 of the Plan Document provides that the Committee shall be comprised of the individuals holding the following positions with the Company: (a) Senior Executive Vice President and Chief Financial Officer; (b) Senior Vice President and General Counsel; (c) Executive Vice President – Planning and Control; (d) Senior Vice President and Treasurer; (e) Senior Vice President – Human Resources; (f) Senior Vice President – Compensation and Benefits; (g) Vice President – Financial Risk Management; (h) Vice President – Counsel, Benefits; and (i) Vice President – Employee Benefits. *See* Plan Document §§ 9.01(a) and (b).

5

23.     Upon information and belief, Defendant Jay Rasulo is an individual who is a resident of the State of California. Mr. Rasulo was the Company's CFO and a member of the Committee until June 30, 2015.

24.     Upon information and belief, Defendant Christine McCarthy is an individual who is a resident of the State of California. Ms. McCarthy has been the Company's CFO since July 1, 2015 and a member of the Committee since at least that time. Immediately prior to becoming CFO, Ms. McCarthy was a member of the Committee by virtue of her position as the Company's Treasurer and therefore a member of the Committee during all relevant times described in this Complaint.

25.     Upon information and belief, Defendant Alan Braverman is an individual who is a resident of the State of California. Mr. Braverman is the Company's General Counsel and has been a member of the Committee during all relevant times described in this Complaint.

26.     Upon information and belief, Defendant Brent Woodford is the Company's Executive Vice President for Planning and Control and a member of the Committee during all relevant times described in this Complaint.

27.     Upon information and belief, Defendant Jonathan S. Headley is an individual who is a resident of the State of California. Mr. Headley has been the Company's Treasurer since September 1, 2015 and a member of the Committee since that time.

28.     Upon information and belief, Defendant Jayne Parker is an individual who is a resident of the State of California. Ms. Parker is the Company's Senior Vice President for Human Resources and a member of the Committee during all relevant times described in this Complaint.

29.     Does 1 through 10, inclusive, are the other individual members of the Committee whose names and identities are currently not known.

## DESCRIPTION OF THE PLAN

30.    At all times relevant to this Complaint, the Plan was an employee benefit plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

31.    At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each participant and for benefits based upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which could be allocated to such participants' accounts.

32.    The stated purpose of the Plan is to "provide a retirement savings vehicle for certain salaried employees of the Company . . . ." *See* Plan Document at Preamble.

33.    The Plan's investments are all held by the Master Trust. As of December 31, 2014, the Plan's interest in the net assets of the Master Trust was 93%. *See* Disney Savings and Investment Plan Financial Statements for 2014 dated June 26, 2015 ("Plan's 2014 Financial Statements") at Note 6.

34.    The Plan Document provides that the investment options in the Plan "may be established by the Committee" and that the Committee "shall have the sole discretion to determine the number and character of" these investment options. *See* Plan Document § 6.01(a)(ii). The Committee "in its sole discretion, shall have the authority to limit or eliminate the availability of" any of the investment options offered to the Plan's participants. *Id*.

35.    The Plan Document provides that the Committee "shall adopt such rules and procedures as it deems advisable with respect to all matters relating to the selection and use of the Investment Funds . . . ." *See* Plan Document § 6.01(b). The Plan Document also provides that Plan participants would have at least three investment funds into which they could invest their retirement savings and that "[e]ach such additional Investment Fund ***shall be diversified*** . . . ." *See* Plan

7

Document § 6.01(h)(i) (emphasis added). In the Plan Document, it states that "[t]he Company recognizes that an investment in an undiversified fund . . . is subject to greater risk than is an investment in a diversified fund . . . ." *Id*. § 6.01(a)(i)(D).

36.     As of December 31, 2014, $538,974,134 or 8.8% of the Master Trust's assets were invested in the Fund. *See* Master Trust's Form 5500 for the year ending December 31, 2014 at Schedule H, Line 4i.

## BACKGROUND FACTS

**I.     The Sequoia Fund Violated the Fund's Investment Policies and the Plan's Diversification Requirements.**

37.     The Fund is an open-end mutual fund managed by the Fund Managers.

38.     The Fund provides reports to its shareholders in June and December each year. The Fund also reports its portfolio holdings in March and September each year in Form N-Q filings with the Securities and Exchange Commission. Defendants, in the exercise of their Plan duties, knew or should have known the content thereof and should have reviewed these documents for red flags.

39.     The Investment Company Act of 1940 (the "1940 Act") provides that a mutual fund's registration's statement must recite all investment policies that can be changed only by shareholder vote. *See* 15 U.S.C. § 80a-8(b). The Fund's investment policies were adopted and subsequently incorporated in its Registration Statement and its Prospectus.

40.     Although the Plan Document required all investment options other than the Company Stock Fund to be diversified, the Fund, as stated in its Prospectus, is "non-diversified," meaning that more than 5% of its assets were invested in the securities of one company. *See* 15 U.S.C. § 80a-5(b) and the Sequoia Fund's 2015 Prospectus, available at: http://www.sequoiafund.com/prospectus_files/Pros15.pdf.

41.     Although it was a "non-diversified" mutual fund, at all relevant times the Fund adopted a policy to limit the percentage of its total assets that were invested in

one industry (the "Concentration Policy"). The Concentration Policy states that the Fund may not:

> Concentrate investments in an industry, as concentration may be defined under the 1940 Act or the rules and regulations thereunder (as such statute, rules or regulations may be amended from time to time) or by guidance regarding, interpretations of, or exemptive orders under, the 1940 Act, or the rules or regulations thereunder published by appropriate regulatory authorities.

*See*, *e.g.*, Sequoia Fund's 2016 Statement of Additional Information, available at: http://www.sequoiafund.com/prospectus_files/SAI16.pdf.

42.     Form N-1A, the registration form for open-end mutual funds like the Sequoia Fund, reflects the SEC's long-standing view that "25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk," and thus "a fund investing more than 25% of its assets in an industry is concentrating in that industry." *See* 1998 Release, 63 Fed. Reg. at 13,927. Accordingly, the Concentration Policy prohibited the Sequoia Fund from investing 25% or more of the fund's total assets in any single industry.

43.     The 1940 Act expressly prohibits a mutual fund like the Sequoia Fund from "deviat(ing) from its policy in respect of concentration in investments in any particular industries or group of industries . . . ." *See* 15 U.S.C. § 80a-5(b).

44.     The Sequoia Fund's 2015 Prospectus also set forth the Fund's strategy of selling assets that are no longer believed to have "fundamental value" (the "Value Policy"). The 2015 Prospectus stated:

> The Fund's investment objective is long-term growth of capital. In pursuing this objective the Fund focuses principally on common stocks it believes are undervalued at the time of purchase and have the potential for growth. A guiding principal in the consideration of common stocks as units of ownership of a business and the purchase of them when the price appears low in relation to the value of the total enterprise. No weight is given to technical stock market studies. The balance sheet and earnings history and prospects of each investment are extensively studied to appraise fundamental value.

*See* 2015 Prospectus dated May 1, 2015 at 1-2, available at: http://www.sequoiafund.com/prospectus_files/Pros15.pdf.

45.    The Value Policy also states that the Fund:

> typically sells the equity security of a company when the company shows deteriorating fundamentals, its earnings progress falls short of investment adviser's expectations or its valuation appears excessive relative to its future earnings.

*Id*. at 2.

46.    As of December 31, 2014, the Sequoia Fund held 11,281,224 shares of Valeant stock. The Fund's holdings in Valeant as of December 31, 2014, accounted for 20% of the Fund's total net assets. *See* Annual Report dated December 31, 2014, available at: http://www.sequoiafund.com/Reports/Annual/Ann14.pdf.

47.    As of March 31, 2015, the Sequoia Fund held 11,281,224 shares of Valeant stock worth $2,240,676,711, accounting for more than 26% of the Fund's total net assets. *See* Sequoia Fund's Form N-Q at Item 1, Schedule of Investments as of March 31, 2015. Thus, with Valeant ***alone***, the Sequoia Fund was violating its Concentration Policy as of ***at least*** March 31, 2015.

48.    As of June 30, 2015, 28.7% of the Sequoia Fund's assets were invested in Valeant stock and 30% of the Fund's assets were invested in stocks in the healthcare industry. *See* Semi-Annual Report dated June 30, 2015, available at: http://www.sequoiafund.com/Reports/Quarterly/SemiAnn15.pdf.

49.    These levels of concentration in a single security are too high for any mutual fund that is a retirement plan investment option, especially considering the security here, Valeant, and the Plan's diversification mandate for investment options. By comparison, the table below shows the largest holdings in each of the ten most common large-cap domestic stock funds in 401(k) plans, according to the latest reports available to Morningstar, a third-party mutual fund research service.

| Fund | Largest Holding | Percent of Total Fund |
|------|-----------------|------------------------|
| VINIX | Apple | 3.0% |
| FCNTX | Facebook | 5.8% |
| FUSEX | Apple | 2.8% |
| FDGRX | Apple | 4.6% |
| DODGX | Time Warner Cable | 4.2% |
| VFINX | Apple | 3.0% |
| AGTHX | Amazon.com | 6.0% |
| VPMCX | Biogen | 5.4% |
| VWNFX | Microsoft | 3.2% |
| VTSMX | Apple | 2.4% |

50. ERISA requires fiduciaries to use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1).

51. Prudent fiduciaries do not, as shown above, invest 401(k) plan assets in large-cap domestic stock funds with such high concentrations in a single stock. *See also* Morningstar, Understanding Mutual Fund Strategies and Fundamental Risk ("For example, if a fund has a stock position over 10 percent or a few over 5 percent, it's more vulnerable to problems at an individual company").

52. This is particularly true in this case given the Plan's diversification restrictions as alleged above.

## II. Valeant Was a Particularly Risky Stock, with Numerous Warning Signs that Should Have Caused Defendants to Remove the Fund.

53. The Sequoia Fund's concentration in Valeant was especially risky—and in violation of the Fund's Value Policy—due to the nature of Valeant's business model. Valeant is a Canadian healthcare company that develops, manufactures and markets branded, generic and branded generic pharmaceuticals, over-the-counter products and other medical products.

11

54.   A "critical element" of Valeant's strategy was "business development" through acquisitions. *See* Valeant's 2014 Annual Report dated February 25, 2015 at 1, available at: http://ir.valeant.com/~/media/Files/V/Valeant-IR/reports-and-presentations/893698-final-ar-2015-v001-x21nf3.pdf.

55.   Valeant developed a reputation as a "serial acquirer" whereby it would buy products and companies and then drastically slash research and development costs to boost profits. Valeant's numerous acquisitions resulted in repeated restructuring and integration costs and constant changes to Valeant's balance sheets and its earnings reports. *See*, *e.g.*, Rapoport, M. and Hoffman, L, (December 15, 2015), "Valeant: An Accounting Pioneer, Too," The Wall Street Journal, available at: http://www.wsj.com/articles/valeant-an-accounting-pioneer-too-1450202504.   Thus, Valeant was overly focused on short-term profits derived from increasing the prices of its drugs but essentially ignored developing newer drugs of its own.

56.   Valeant's accounting methods further concealed its true value. Valeant used "cash earnings per share" as its earnings measure. This method shows far greater income than under standard GAAP rules that investors typically use to compare companies. Under GAAP, the company posted $70 million in net income for the first nine months of 2015. Under its own cash earnings measure, however, the company posted a ***profit*** of $2.7 billion. *Id.*

57.   The Sequoia Fund's major investment in Valeant, with its unconventional business model and non-traditional financial statements and metrics, was diametrically opposed to the Fund's Value Policy.

58.   Defendants knew or should have known of these problems with Valeant and the Fund no later than September 2015.

**III.   Prudent Fiduciaries Do Not Invest 401(k) Assets in Mutual Funds with High Concentrations in Valeant (or any other) Stock.**

59.   The Fund was a large-cap domestic equity Fund.

60.    Of the ten most common large-cap domestic equity funds included in 401(k) plans by similar fiduciaries, only one included any investment in Valeant in 2014 or 2015. As shown in the table below, its holding was a tiny fraction of the Fund's concentration in Valeant, representing 0.1% of that fund's assets, as opposed to nearly 20% of Sequoia's assets.

| Fund | Fee | 2015 % Valeant[2] | 2014 % Valeant | 2014 Return | 2015 Return | 2016 Return to June 30, 2016 |
|------|-----|-------------------|----------------|-------------|-------------|------------------------------|
| VINIX | 4 bps | 0.0% | 0.0% | 13.65% | 1.37% | 3.55% |
| FCNTX | 70 bps | 0.0% | 0.0%[3] | 9.56% | 6.46% | 0.32% |
| FUSEX | 10 bps | 0.0%[4] | 0.0%[5] | 13.59% | 1.31% | 3.53% |
| FDGRX | 88 bps | 0.1%[6] | 0.3%[7] | 14.44% | 7.83% | -2.68% |
| DODGX | 52 bps | 0.0% | 0.0% | 10.40% | -4.49% | 3.42% |
| VFINX | 16 bps | 0.0% | 0.0% | 13.51% | 1.25% | 3.51% |
| AGTHX | 65 bps | 0.0%[8] | 0.0%[9] | 9.30% | 5.36% | 1.16% |
| VPMCX | 40 bps | 0.0%[10] | 0.0%[11] | 18.72% | 2.58% | 0.66% |
| VWNFX | 34 bps | 0.0%[12] | 0.0%[13] | 11.16% | -3.22% | 4.00% |
| VTSMX | 16 bps | 0.0% | 0.0% | 12.43% | 0.29% | 3.35% |

61.    By comparison, the Sequoia Fund was more expensive, dramatically more concentrated in Valeant, and underperformed all 10 of the most common alternative funds in each of the three periods.

| Fund | Fee | 2015 % Valeant[14] | 2014 % Valeant | 2014 Return | 2015 Return | 2016 Return to June 30, 2016 |
|------|-----|--------------------|----------------|-------------|-------------|------------------------------|
| SEQUX | 100 bps | 19.3% | 20.0% | 7.55% | -7.29% | -11.60% |

---

[2] As of Dec. 31, 2015 unless otherwise noted.
[3] As of Sept. 30, 2014.
[4] As of Aug. 31, 2015.
[5] As of Aug. 31, 2014.
[6] As of Nov. 30, 2015.
[7] As of Nov. 30, 2014.
[8] As of Aug. 31, 2015.
[9] As of Aug. 31, 2014.
[10] As of Sept. 30, 2015.
[11] As of Sept. 30, 2014.
[12] As of Oct. 31, 2015.
[13] As of Oct. 31, 2014.
[14] As of Dec. 31, 2015 unless otherwise noted.

13

62.    Meanwhile, other investors who had invested in the Sequoia Fund pulled their money out as the Valeant concentration increased. Investors withdrew more than $500 million from the Fund in 2014 alone, and an additional $213 million during the first 10 months of 2015.[15] Defendants should have monitored these outflows to determine whether the Plan should take similar action.

## IV.    There Were Ample Warning Signs Defendants Should Have Seen that the Sequoia Fund's Concentration in Valeant Made the Fund an Imprudent Investment.

63.    Defendants should have been vigilant in selecting and monitoring the prudence of all Plan investment options. But they should have been particularly careful with monitoring the Sequoia Fund given the half-billion of Plan assets invested therein and the Fund's lack of diversification. Notwithstanding these facts and duties, Defendants failed to properly monitor and remove the Fund.

64.    Valeant's controversial business practices and opaque financial statements ultimately led to a substantial fall in its stock price in September 2015 that significantly affected the Sequoia Fund's performance. However, there were serious questions about Valeant's business model and accounting methods long before its precipitous decline that should have alerted Defendants that the Sequoia Fund's substantial investment in Valeant made the Sequoia Fund an imprudent investment for the Plan's participants.

65.    In March 2014, Jim Grant, the editor of an investment journal, criticized Valeant for its notable lack of concern for research and development, calling it a "financialized pharmaceutical company" and stating that "the longer a business is under a Valeant umbrella, the worse it performs."

66.    In May 2014, Bronte Capital's John Hempton announced that his fund was shorting Valeant, calling its accounting "difficult to comprehend."

---

[15]    http://www.bloomberg.com/news/articles/2015-11-10/valeant-holder-sequoia-fund-sees-98-9-million-in-outflows.

67.     On May 15, 2014, hedge fund billionaire Jim Chanos voiced his skepticism when he stated that Valeant was playing "aggressive accounting games." Mr. Chanos also criticized Valeant's acquisition strategy, noting the dangers and potential accounting issues associated with relying on purchasing other companies for long-term growth.

68.     Morgan Stanley, which served as an adviser to Valeant in its failed $53 billion hostile bid for Allergan, Inc. also voiced its skepticism of Valeant. In June 2014, an email from a Morgan Stanley investment banker was released in which he called Valeant a "house of cards."

69.     In February 2015, Valeant purchased a portfolio of older branded drugs. After Valeant acquired them it dramatically increased their prices. Two of the drugs, Nitropress and Isuprel, were important cardiac medicines used by hospitals during heart surgery. These price increases prompted a harsh reaction from politicians, insurers, hospitals and the general public, leaving the impression that Valeant's business was primarily driven by acquisitions and temporary, but unsustainable, price increases.

70.     On March 26, 2015, Charlie Munger, the Vice Chairman of Berkshire Hathaway, stridently criticized Valeant and its then CEO, J. Michael Pearson. When asked about Valeant at an investor meeting, Mr. Munger compared Valeant to ITT, a company notorious for having earnings that were derived from its aggressive acquisition strategy but whose true value was hollow because it would cover the losses from one acquisition with the "paper profits" of the next one. Mr. Munger stated: "Valeant is like ITT and Harold Geneen (ITT's former CEO) come back to life, only the guy is worse this time." "The guy" Mr. Munger referred to was Valeant's CEO, J. Michael Pearson.

71.     The harsh criticisms of the Sequoia Fund's investment strategy and its substantial investment in Valeant did not come from just a few Wall Street investors. At the Sequoia Fund's annual investors' day that took place on May 15, 2015, the

15

1  Fund's investment in Valeant dominated the conversation. The Sequoia Fund's
2  managers openly stated that they would not sell Valeant, in contravention of the
3  Fund's Concentration Policy.

4  72.  An investor asked the following at the May 15, 2015 investors' day
5  meeting to the Fund's investment manager, Bob Goldfarb:

6       Q:  My main question was then do you plan on keeping the
7          (Fund's) holdings (of Valeant) at 20% or more of your
        portfolio, or are you going to reduce that?

8       A:  We are going to hold it. We believe (Valeant) will
9          continue to grow (earnings per share) at a rapid rate and
        that the stock should do quite well.

10  *See* Transcript from May 15, 2015 Investors' Day at 16, available at:
11  http://www.sequoiafund.com/Reports/Transcript15.pdf.

12  73.  Mr. Goldfarb's response to the question about the Fund's continued
13  investment in Valeant demonstrated that the Fund was violating the Fund's
14  Concentration Policy by investing more than 25% of its assets invested in a single
15  security, when the policy prohibited investment of more than 25% in a single
16  *industry*. Mr. Goldfarb's comments also demonstrated the Fund's investment in
17  Valeant was violating the Value Policy in which the Fund purported to focus on a
18  company's "balance sheet and earnings history."

19  74.  The May 15, 2015 investors' meeting also made clear that the Sequoia
20  Fund's earnings were substantially linked to Valeant. If Valeant's stock price did not
21  continue to increase at its unsustainable rate, or, even worse, declined, it would have a
22  dramatic effect on the Sequoia Fund. By 2015, as Valeant went, so went the Sequoia
23  Fund.

24  75.  On December 31, 2014, the Sequoia Fund reported that Valeant
25  represented 20% of its portfolio. Given the Plan's diversification policy and the risk
26  that high concentrations in a single investment pose to retirement plan investors,
27  Defendants should have taken steps to remove the fund from the Plan.

28

76.    On March 31, 2015, the Sequoia Fund reported that Valeant represented 26% of its portfolio. Given the Plan's diversification policy and the risk that high concentrations in a single investment pose to retirement plan investors, Defendants should have taken steps to remove the fund from the Plan.

77.    The Sequoia Fund's Semi-Annual Report issued to investors on June 30, 2015 also should have made it clear to Defendants that the Fund was no longer a prudent investment option for the Plan's participants (if indeed it ever was). In the Semi-Annual Report, it was disclosed that 28.7% of the Fund's holdings were in Valeant and that 30% of its holdings were concentrated in Healthcare stocks. *See* Semi-Annual Report dated June 30, 2015.

78.    Information subsequent to the Fund's semi-annual report dated June 30, 2015 provided further evidence that the Sequoia Fund's concentrated investment Valeant made the Sequoia Fund an imprudent investment option for the Plan's participants. On August 14, 2015, Senator Bernie Sanders (D. Vt.) and Congressman Elijah Cummings (D. Md.) requested information from Valeant on why it had aggressively increased the price of Nitropress and Isuprel.

79.    On September 28, 2015, Democrats on the U.S. House of Representatives Oversight and Government Reform Committee signed a letter to the chairman, Rep. Jason Chaffetz (R. Utah) asking him to subpoena Valeant about is "massive price increases."

80.    The criticisms of Valeant went far beyond public relations concerns resulting from any price increases—they questioned Valeant's ***entire*** business model. In September 2015, Andrew Left of Citron Research published a report on Valeant citing the company's dramatic price increases. According to Mr. Left, Valeant's model was to "jack up prices and cut spending." Mr. Left also noted that in particular, Valeant was dramatically cutting spending on research and development (R&D), negatively impacting its ability to develop new drugs. Mr. Left noted that other pharmaceutical companies in the industry spent on average 17% on R&D while

17

Valeant was only spending 3%. On October 5, 2015, a Deutsche Bank analyst concluded that Valeant increased the prices on 54 medications in 2015 by an average of 66%. This percent increase was dramatically higher than the industry average of 5% per year.

81.    On October 15, 2015, Valeant disclosed that it received two subpoenas concerning its drug pricing strategy.

82.    On October 21, 2015, Citron Research released report titled: "Valeant: Could this be the Pharmaceutical Enron?" In this report, Citron emphasized Valeant's mysterious relationship with Philidor, a pharmacy that distributes drugs for specialty pharmacy, which Valeant had an option to purchase. In its report, Citron insinuated that Valeant was involved in deceptive accounting practices involving Philidor and asked whether Valeant was "Enron part Deux??"

83.    The increasing concentration in Valeant stock and the public information about Valeant, the increasing concentration of the Fund's investment in Valeant, and the Plan's diversification policy should have caused Defendants to remove the Sequoia Fund from the Plan no later than September 2015.

## V.    The Sequoia Fund's Valeant Investment Caused the Plan Substantial Losses.

84.    Between October 20 and October 22, 2015, Valeant's stock price fell 30%. On October 30, 2015, in an effort to calm the price of Valeant stock, investor William Ackman held a conference call. Following the call, the price of Valeant's shares fell another 16%.

85.    Even dissension *within* the Sequoia Fund did not cause Defendants to remove the Sequoia Fund from the Master Trust's list of available investment funds. On October 25, 2015, two of the Sequoia Fund's four independent directors, Vinod Ahooja and Sharon Osberg, abruptly resigned to publically voice their dissent over the Fund's strategy. Their resignations followed the Sequoia Fund's announcement that it had purchased *an additional* 1.5 million shares of Valeant.

18

86.     Undeterred by the wave of internal and external criticism, the Sequoia Fund sent a letter to Fund shareholders on October 28, 2015 to try to rationalize its reckless investment in Valeant. The letter stated:

> We work hard to understand Valeant and its business model. Our belief has always been that (Valeant's CEO) is honest and extremely driven. He does everything legally permissible to maximize Valeant's earnings. One lesson of recent events is that sometimes doing everything legally permissible to maximize earnings does not create shareholder value. All enduring businesses must strive to earn and maintain a good reputation. Because of its large indebtedness and need to tap capital markets to make acquisitions Valeant in particular needs the confidence of the credit market to execute its business model.

*See* Letter to Fund Shareholders from the Fund Managers dated October 28, 2015, available at:  http://www.sequoiafund.com/Letter%20to%20Clients%20and%20Shareholders.pdf.

87.     From its peak in August 2015 until November 17, 2015, Valeant stock declined from $263 a share to less than $70 a share. During the same time, the Sequoia Fund lost approximately 25% of its value.

88.     Between October 1, 2015 and December 31, 2015, the Sequoia Fund lost 9.1% of its value. During the same period, the Standard and Poor (S&P) 500 Index Fund ***gained*** 7.04%. During 2015, the Sequoia Fund lost 7.31% of its value. Nearly all of this decline, 6.3% of the 7.31%, was due to the Fund's holdings in Valeant. *See* Sequoia Fund's Semi-Annual Report dated December 31, 2015 at 4.

89.     According to a report published on November 19, 2015, the Sequoia Fund ranked 1,258 out of 1,265 large capitalization stock mutual funds based on 1-year performance. This dismal ranking was due to the precipitous decline in Valeant's stock price.

90.     The Plan, Plaintiff, and similarly-situated participants suffered the consequences

## **DEFENDANTS WERE FIDUCIARIES**

91.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

92.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

93.    Each of the Defendants was a fiduciary during the Class Period as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A)—either as a named fiduciary or *de facto* fiduciary—with respect to the Plans and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

94.    The Plan Document provides that "[t]he general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be assigned to (the Committee)." *See* Plan Document § 9.01. The Committee also "interprets (the Plan's) provisions and resolves all issues arising in the administration of the Plan." *See* Plan's 2014 Financial Statements at Note 1.

95.    As set forth above, the Plan Document also provided the Committee the authority and discretion to, among other things: (a) determine the "number and character" of the investment options available to the Plan's participants; (b) limit or eliminate the availability of an investment option; and (c) adopt rules and procedures

20

concerning the selection and use of the investment options available to Plan participants. *See* ¶¶ 27-28, *supra* and Plan Document §§ 6.01(a)(ii) and (h).

96.   Under the Plan Document, the Committee has "full discretionary power and authority as may be necessary to carry out the provisions of the Plan and to control and manage the operation and administration of the Plan . . . ." *See* Plan Document § 9.06. This includes the discretionary power to "impose reasonable restrictions (including temporary prohibitions) on Participants' contribution elections, changes in contribution elections, investment elections, changes in investment elections, loans, withdrawals, and distributions to accommodate the administrative requirements of the Plan." *Id*. § 9.06(f).

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

97.   ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

98.   ERISA imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." *See* ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

99.   The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan

with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

100.   Section 404(a)(1)(B) of ERISA also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ." *See* ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

101.   For a retirement plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans including employer securities, to ensure that each investment is a suitable option for the Plans.

102.   A fiduciary to a large 401(k) plan, like the Plan, has a duty to periodically examine and check the Plan's investments. *Tibble v. Edison Int'l,* 135 S. Ct. 1823 (2015).

103.   Given the Plan's large holding in the Fund and the serious risks associated with lack of diversification, a prudent fiduciary would have removed or replaced the Fund when it stopped violated its own limitations on concentration.

104.   Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

    (a)    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

    (b)    are knowledgeable about the operations of the Plans the goals of the Plan and the behavior of Plans' participants;

(c)    are provided with adequate financial resources to do their jobs;

(d)    have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

(e)    have access to outside, impartial advisors when needed;

(f)    maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(g)    report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands on fiduciaries.

105.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

106.    Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## **CLASS ACTION ALLEGATIONS**

107. To the extent appropriate, Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons, excluding Defendants, who were participants in or beneficiaries of the Plan at any time from January 1, 2015 up to and including the date of judgment in this action (the "Class Period") and whose Plan accounts included investments in the Sequoia Fund (the "Class").

108. The members of the Class, which is estimated to number in the thousands, are so numerous that joinder of all members is impracticable. Indeed, based on public filings by the Plan, there are potentially thousands of class members. For instance, based on the Plan's Form 5500 Annual Returns filed with the Department of Labor ("DOL") and dated October 14, 2015 lists 51,513 Participants in the Plan for the plan year ending 2014.

109. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

> (a) whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;
>
> (b) whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;
>
> (c) whether Defendants violated ERISA; and
>
> (d) whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

108. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained

24

damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

109.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

110.   Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

111.   Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

112.   Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

113.   Class action status is warranted under Rule 23(b)(3) because a class action would be superior to individual actions and common questions of law and fact predominate over individual questions.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Failure to Prudently and Loyally Manage the Plan and Assets of the Plan)**

(Plaintiff v. All Defendants)

114.   Plaintiff incorporates by reference the paragraphs above.

115.   As alleged above, during the Class Period, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto*

fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

116.   As alleged above, the scope of the fiduciary duties and responsibilities of Defendants included managing the assets of the Plan for the sole and exclusive benefit of Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Master Trust's trustee regarding the same, determining how to invest Fund assets as "advisable," evaluating the merits of the Plan's investments on an ongoing basis, administering the operations of the Master Trust and taking all necessary steps to ensure that the Plan's assets were invested prudently.

117.   According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

118.   Defendants were obliged to prudently and loyally manage all of the Plan's assets pursuant to these duties.

119.   Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of maintaining the Sequoia Fund as an investment in the Plan. They failed to conduct an appropriate investigation of the merits of continued investment in the Sequoia Fund. Given that the Sequoia Fund was "non-diversified," its open violation of the Concentration Policy and the Value Policy and the widespread public disclosure about the riskiness of Valeant itself, its poor performance and its high fees, such an investigation would have revealed no later

than September 2015 to a reasonably prudent fiduciary the imprudence of continuing to offer the Sequoia Fund as an investment option or make and maintain investment in the Fund under these circumstances.

120.   Contrary to their duties and obligations under the Plan Document and ERISA, Defendants failed to prudently manage the assets of the Plan. Specifically, during the Class Period, Defendants knew or should have known that the Sequoia Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an imprudent investment in light of widely available public information.

121.   Nonetheless, during the Class Period, these Defendants continued to permit the Plan to offer the Sequoia Fund as an investment option and continued to permit the Plan to invest in the Sequoia Fund.

122.   Defendants breached their fiduciary duty respecting the Plan's investment in the Sequoia Fund described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the Plan to offer or invest in the Sequoia Fund.

123.   Given the information described above, Defendants could not possibly have acted prudently when they continued to offer or invest the Plan's assets in the Sequoia Fund because, among other reasons:

(a)   Defendants knew of and/or failed to investigate the Sequoia Fund circumstances as alleged above;

(b)   The risk associated with the investment in the Sequoia Fund during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investments.

124.   Knowing of this extraordinary risk, Defendants had a duty to remove the Sequoia Fund as an investment option for the Plan's participants and avoid permitting the Plan or any Participant from investing the Plan's assets in it.

125.   Further, knowing that the Plan was heavily invested in the Sequoia Fund, Defendants had a heightened responsibility to divest the Plan of the Sequoia Fund when it was imprudent.

126.   As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

127.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## SECOND CAUSE OF ACTION

### (Failure to Follow the Express Terms of the Plan)

(Plaintiff v. All Defendants)

128.   Plaintiff incorporates by reference the allegations above.

129.   As alleged above, the Plan specifically required that each Investment Fund offered to Plan Participants "***shall be diversified***." *See* Plan Document § 6.01(h)(i) (emphasis added). The Plan Document further recognizes that "[t]he Company recognizes that an investment in an undiversified fund . . . is subject to greater risk than is an investment in a diversified fund . . . ." *Id.* § 6.01(a)(i)(D).

130.   Maintaining the Plan's investment in the Sequoia Fund violated the Plan's prohibition on non-diversified funds, since the Fund's own prospectus specifically stated that that the Fund was "non-diversified," meaning that more than 5% of its assets were invested in the securities of one company. *See* 15 U.S.C. § 80a-5(b); Sequoia Fund's 2015 Prospectus, available at: http://www.sequoiafund.com/prospectus_files/Pros15.pdf.

131.   By 2015, moreover, the Sequoia Fund was so far from being diversified that it violated the Fund's *own* limitations on concentration of assets, with Valiant securities accounting for over 28 percent of the Fund's assets.

132.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### THIRD CAUSE OF ACTION

### (Co-Fiduciary Liability)

(Plaintiff v. All Defendants)

133.   Plaintiff incorporates by reference the allegations above.

134.   This Count alleges co-fiduciary liability against all Defendants.

135.   As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

136.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

137.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

138.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in the breaches of the other Defendants because, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Sequoia Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

139.   ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

140.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Participants and beneficiaries, lost millions of dollars of retirement savings.

141.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

1.   A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

2.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits Defendants made through use of the Plans'

30

assets; and to restore to the Plans all profits which the Plans and participants would have made if Defendants had fulfilled their fiduciary obligations;

3. Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

4. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligation;

5. An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investments;

6. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

7. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

8. An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

9. An Order for equitable restitution and other appropriate equitable and injunctive relief against all Defendants.

31

DATED: June 28, 2016

**STRIS & MAHER LLP**

/s/ Victor O'Connell
Victor O'Connell


**IZARD KINDALL & RAABE LLP**

/s/ Mark P. Kindall
Mark P. Kindall
MARK P. KINDALL (SBN 138703)
   mkindall@izardnobel.com
IZARD KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone:   (860) 493-6292
Facsimile:    (860) 493-6290


*Attorneys for Plaintiff* PATRICIA DU VALL,
individually and as a representative of a class
of similarly situated plan participants, on
behalf of the DISNEY SAVINGS AND
INVESTMENT PLAN